# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

DONALD H. KRIVITSKY
JOSEPH S. JABLECKI,
individually and as co-owners of SUD
AVIATION - SNIAS (Aerospatiale) Alouette
II Model SE-3130 Helicopter Serial Number
1312,
        Plaintiffs,

v.                                             C.A. No. 010-219-ML

UNITED STATES OF AMERICA,
        Defendant.

## MEMORANDUM AND ORDER

The dispute in this litigation concerns an airworthiness certificate issued in 2004 for a helicopter now owned by the plaintiffs. The certificate was issued by a Designated Airworthiness Representative ("DAR") of the Federal Aviation Administration ("FAA"). The certificate was suspended by the FAA in 2008. The matter before the Court in this case is the United States' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

## I. Facts

Plaintiffs Donald H. Krivitsky ("Krivitsky"), a Rhode Island resident, and Joseph S. Jablecki ("Jablecki"), an Alabama resident, formed CAVU Copters, Inc. ("CAVU Copters") to conduct helicopter air tours in Mobile, Alabama. Complaint ¶ 15. On May 6, 2006,

1

CAVU Copters purchased a French-manufactured 1959 Alouette II Model SE-3130 Helicopter, Serial Number 1312, Registration N225RW (the "Helicopter") for the planned air tours business. Complaint ¶ 16.

From the materials submitted by the parties, it appears that the Helicopter was manufactured in France in 1959, after which it was delivered to the German Air Force for use as a military aircraft.   Gov.'s Ex. 3a ¶ 10.   Forty-three years later, in November 2002, the Helicopter was canceled in the German military aircraft register.   It was then sold to private parties before it was resold to CAVU Copters.   Id. ¶ 11, 13-14.

At the time of CAVU Copters's purchase, the Helicopter had a Standard Airworthiness Certificate ("SAC") in the Normal Category, which was necessary to transport passengers for hire.[1]  Complaint ¶¶ 17, 18.   The SAC had been issued for the Helicopter on July 24, 2004 by DAR  Robert R. Cernuda ("Cernuda") on behalf of the FAA after Cernuda had conducted an airworthiness inspection.  Complaint ¶ 14, Gov. Mem. 2.  According to the "Application for Airworthiness Certificate," the SAC was issued pursuant to 14 C.F.R. §

---

[1]

The other type of classification is a Special Airworthiness Certificate in the Experimental Category.   Aircraft with this classification may not be used to carry passengers or cargo for hire.  Complaint ¶ 10-13. An appropriate and current airworthiness certificate is required to operate a civil aircraft within the United States.    14 C.R.F. §§ 21.183, 91.203.   See Mike's Contracting, LLC v. United States, 92 Fed. Cl. 302, 304 n. 1 (Fed. Cl. 2010).

21.183(d)[2], applicable to "[u]sed aircraft and surplus aircraft of the U.S. Armed Forces." See Gov.'s Ex. 3a ¶ 19.

In late 2006, the FAA began a comprehensive, nationwide review of Alouette helicopter records. Gov. Mem. 2. According to the FAA, it discovered during the review that "the recorded documentation of many of these helicopters, including [the Helicopter] failed to properly support the issuance of a [SAC] in the normal category." Gov.'s Ex. 3a ¶ 20.

On November 16, 2006, shortly before starting the air tours operations, Krivitsky and Jablecki received a notification letter from the FAA stating that any further operation of the Helicopter would be contrary to the Code of Federal Regulations. This notification effectively grounded the Helicopter. Complaint ¶ 23. Meanwhile, in May 24, 2007, Krivitsky and Jablecki purchased the Helicopter from CAVU Copters. Complaint ¶ 19. On August 26, 2008, after FAA employees inspected the Helicopter, the FAA issued an Emergency Order of Suspension (the "Emergency Order") to Krivitsky and Jablecki, which suspended the Helicopter's SAC in the Normal Category. Complaint ¶ 24, Gov. Mem. 2. According to the Emergency Order, the Helicopter was not eligible for an SAC in the Normal

---

[2]

14 CFR 21.183 (d) was applicable originally to "Other aircraft" until it was amended in October 2006 to apply to "Used aircraft and surplus aircraft of the U.S. Armed Forces." 14 CFR 21.183 (c) is applicable to "Import Aircraft." Subsections (c) and (d) have different requirements for the issuance of an SAC.

Category, notwithstanding issuance of such a certificate four years earlier. Complaint ¶ 25. The Emergency Order stated, *inter alia*, that the Helicopter was not eligible for an SAC as an "import aircraft" under 14 CFR 21.183(c) because (1) a required review, "if done properly," of historical records would have disclosed that the Helicopter had not been issued an SAC when it was delivered for use by the German military; and (2) a Certificate of Airworthiness for Export by the French aviation authority lacked a statement that the Helicopter (a) had been examined and was found to comply with United States aviation regulations, and (b) complied with the type design and was in condition for safe operation. Gov.'s Ex. 3a ¶ 30 and page 10. The Emergency Order also set forth that the Helicopter was not entitled to an SAC as "Other Aircraft" under 14 CFR 21.183(d) because (1) the applicant failed to present sufficient evidence that the Helicopter conformed to the approved type design; and (2) the FAA DAR improperly found that the Helicopter conformed to the approved type design because he "failed to follow published FAA certification procedures and properly make the required conformity determination, and hence, erroneously found that [the Helicopter] was in condition for safe operation." Id. Page 10.

In March 2009, the FAA issued a Special Airworthiness Certificate in the Experimental Category for the Helicopter, which permitted operation of the Helicopter for research, flight testing,

4

crew training, and exhibition. Gov. Mem. 2. According to the plaintiffs, the FAA has conceded, and an Administrative Law Judge ("ALJ") has found, that the Helicopter was erroneously issued an SAC in the Normal Category. Complaint ¶ 26.

II.  Procedural History

Krivitsky and Jablecki filed a claim with the FAA regarding this matter. That claim was denied on October 15, 2008, as was their subsequent request for reconsideration. Complaint ¶ 4. Based on the materials submitted with the parties' memoranda, Krivitsky and Jablecki challenged the Emergency Order before the National Transportation Safety Board ("NTSB"). After an ALJ granted summary judgment in favor of the Administrator in December 2008, the NTSB reversed the decision and remanded the case for further fact finding. On June 25, 2009, in an oral bench decision following an evidentiary hearing, the ALJ affirmed the Administrator's Emergency Order and suspended the SAC of the Helicopter. Gov.'s Ex. 4, Page 19 of 23. The ALJ concluded that "the Administrator has erred in the issuance of this standard airworthiness certificate, but the evidence is also clear that it shouldn't have been [issued] and the Administrator has appropriately, in this case, done an emergency order of suspension." Id. Page 18 of 23.

On October 14, 2009, Krivitsky and Jablecki filed a one-count complaint in United States District Court for the District of

Columbia against the United States of America (the "Government") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1). Complaint ¶ 4. The plaintiffs alleged that the FAA acted negligently in issuing the SAC in 2004 and that they suffered financial losses as a result. In other words, Krivitsky and Jablecki are not challenging the 2008 Emergency Order in this case. Rather, their claim is based on the erroneous (and, as they allege, negligent) issuance of the 2004 SAC prior to the plaintiffs' purchase of the Helicopter and their investment in the helicopter tours enterprise.

On January 19, 2010, the Government filed a motion to dismiss the complaint on the ground that venue was improper in the District of Columbia because neither plaintiff resided there and the related conduct - the inspection of the Helicopter and issuance of the SAC - occurred in Florida. The Government's motion was granted and the case was transferred to this Court on April 29, 2010.

Following a Rule 16 conference on September 15, 2010, the parties engaged in discovery. On September 1, 2011, the Government filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Specifically, the Government asserted that (1) Cernuda was not a government employee when he issued the SAC; (2) the United States has not waived its sovereign immunity for claims arising out of misrepresentation; and (3) the plaintiffs cannot plead a cause of

action under state law.  The plaintiffs  filed an objection on

October 27, 2011, rejecting the Government's contentions entirely.

On November 7, 2011, the Government filed a reply to the objection.

## III.  Standard of Review

Rule 12 of the Federal Rules of Civil Procedure governs the

dismissal of a complaint.  A motion to dismiss for lack of subject-

matter jurisdiction pursuant to Fed. R. Civ. P.  12(b)(1) is

reviewed under the identical standard as a motion to dismiss for

failure to state a claim upon which relief can be granted pursuant

to Fed. R. Civ. P. 12(b)(6).  See, e.g.,  Puerto Rico Tel. Co. v.

Telecomm. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 14 n.10 (1st

Cir. 1999) ("The standard of review . . . is the same for failure

to state a claim and for lack of jurisdiction.").

The  Court  accepts  as  true  "the  well-pleaded  factual

allegations of the complaint" and draws "all reasonable inferences

therefrom in the plaintiff's favor." Martin v. Applied Cellular

Tech., Inc., 284 F.3d 1, 6 (1st Cir. 2002); McCloskey v. Mueller,

446 F.3d 262, 266 (1st Cir. 2006).  A complaint need not contain

"detailed factual allegations;" however, it is subject to dismissal

if it fails to state facts sufficient to establish "a claim to

relief that is plausible on its face." Bell Atl. Corp. v. Twombly,

550 U.S. 555, 570, 127 S.Ct. 1955, 1965, 1974, 167 L.Ed.2d 929

(2007); S.E.C. v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010).  In

its analysis, the Court ignores "conclusory allegations, improbable

inferences, and unsupported speculation." Hostar Marine Transp. Sys., Inc., v. United States, 592 F.3d 202, 207 (1st Cir. 2010).

In the context of a Rule 12(b)(1) motion, the Court "may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations" without converting a motion to dismiss to a motion for summary judgment. Dynamic Image Tech., Inc. v. United States, 221 F.3d 34, 37-38 (1st Cir. 2000)(citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 890-91 (1st Cir. 1977)).

### III. Discussion

(A)   The FAA Certification Process

The Administrator of the FAA (the "Administrator") is tasked with promoting safe flight of civil aircraft in air commerce by, *inter alia*, "prescribing . . . regulations and minimum standards in the interest of safety for . . . inspecting, servicing, and overhauling aircraft . . . equipment and facilities for, and the timing and manner of, the inspecting, servicing, and overhauling..." 49 U.S.C. § 44701 (a)(1), (2). United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 804, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

To that end, "the FAA has promulgated a comprehensive set of regulations delineating the minimum safety standards with which the designers and manufacturers must comply before marketing their

8

products." Id. at 804-805 (summarizing certification process).

Prior to introducing a new type of aircraft, a manufacturer must first obtain a type certificate for an aircraft which requires a finding by the Administrator "that the aircraft . . . is properly designed and manufactured, performs properly, and meets the regulations and minimum standards prescribed under section 44701(a)..." 49 U.S.C. § 44704 (a). Varig Airlines at 805-806. Mass production of an approved aircraft necessitates a production certificate for which "the manufacturer must prove to the FAA that it has established and can maintain a quality control system to assure that each aircraft will meet the design provisions of the type certificate." Id. at 806 (citing 14 CFR §§ 21.139, 21.143 (1983)).

Before an aircraft may operate as a civil aircraft in air commerce, each aircraft requires an airworthiness certificate that warrants "that the aircraft's conforms to its type certificate and, after inspection, its condition for safe operation." 49 U.S.C. § 44704(d)(1)[3]. Varig Airlines at 806; Holbrook v. United States,

---

[3]

49 U.S.C. § 44704(d)(1) provides:
The registered owner of an aircraft may apply to the Administrator for an airworthiness certificate for the aircraft. The Administrator shall issue an airworthiness certificate when the Administrator finds that the aircraft conforms to its type certificate and, after inspection, is in condition for safe operation. The Administrator shall register each airworthiness certificate and may include appropriate information in the certificate. The certificate number or other individual designation the Administrator requires shall be displayed on the aircraft. The Administrator may include in an airworthiness certificate terms

9

749 F. Supp.2d 446, 448 (S.D.W.Va. 2010)(summarizing regulatory background of FAA certification).  The Administrator may reinspect the aircraft at any time, 49 U.S.C. §44709(a), and may issue an order "amending, modifying, suspending, or revoking" a certificate if, *inter alia*, "the Administrator decides after conducting a reinspection, reexamination, or other investigation that safety in air commerce or air transportation and the public interest required that action." 49 U.S.C. §44709(b).

Because the FAA does not have the necessary personnel to complete such an "elaborate compliance review process," including the issuance of airworthiness certificates, the Administrator is authorized to "delegate certain inspections and certification responsibilities to properly qualified persons." <u>Variq Airlines</u> at 807; 14 CFR 183.29 (1984). "Subject to regulations, supervision, and review the Administrator may prescribe, the Administrator may delegate to a qualified private person, or to an employee under the supervision of that person, a matter related to --(A) the examination, testing, and inspection necessary to issue a certificate under this chapter; and (B) issuing the certificate." 49 U.S.C. § 44702(d)(1).

A 1983 amendment to Part 183 of the Federal Aviation Regulations established DARs as a new category of persons appointed

---

required in the interest of safety.

to act as representatives of the Administrator in performing certain certification functions of the Federal Aviation Act of 1958.  48 Fed. Reg.  16176-01 (April 4, 1983)).  Pursuant to 14 CFR § 183.33, a DAR is authorized "within limits prescribed by and under the general supervision of the Administrator," to perform, for a fee,

> "examination, inspection, and testing services necessary to issue, and to determine the continuing effectiveness of, certificates, including issuing certificates, as authorized by the Director of Flight Standards Service in the area of maintenance or as authorized by the Director of Aircraft Certification Service in the areas of manufacturing and engineering." 14 C.F.R. § 183.33.

(B)   The Federal Torts Claims Act

(1) "Employee of the Government"

The Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346(b), waives sovereign immunity for suits against the United States and permits a civil action against the government

> "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any _employee of the government_ while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (emphasis added).

An "employee of the government" includes "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or

11

permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. Acts of independent contractors, however, are excluded from government liability. Leone v. United States, 910 F.2d 46, 49 (2d Cir. 1990)("The FTCA waiver of sovereign immunity . . . does not extend to independent contractors."). In other words, subject matter jurisdiction in FTCA cases depends on government employee status.

The decisive factor in determining whether an individual is a federal employee or an independent contractor is "the amount of control the federal government has over the physical performance of the individual." Charlima, Inc. v. United States, 873 F.2d 1078, 1079, 1080-81 (8th Cir. 1989)(noting that courts addressing this issue have relied on the factors set out in Restatement (Second) of Agency §§ 2 & 220 (1957)). Only if the government has control over the day-to-day physical performance of the individual may a contractor be considered a federal employee. Logue v. United States, 412 U.S. 521, 528, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973)(holding that, where deputy United States marshal had no authority to control activities of county sheriff's employees, they were employees of contractor with the United States and not employees of a federal agency); United States v. Orleans, 425 U.S. 807, 814-15, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976)(holding that employees of community action agency receiving all its funding from the United States were not federal employees for purposes of the

FTCA).

In _Charlima, Inc. v. United States_, the Eighth Circuit addressed the question of whether DARs are considered federal employees under Section 2671. _Charlima, Inc. v. United States_, 873 F.2d at 1080-82. Charlima brought a suit against the United States claiming that a DAR was negligent in failing to discover damage to an airplane Charlima was purchasing, which damage resulted in withdrawal of the airworthiness certificate. The United States District Court for the District of Nebraska found that the government was immune from tort liability under the discretionary function exception. _Charlima_, 873 F.2d at 1079.

The Eighth Circuit Court of Appeals, in affirming the district's court's decision to grant the government's motion for summary judgment, held that the DAR "was not a federal employee and that the government is therefore not liable under the [FTCA]." _Id._ The _Charlima_ Court concluded that "the FAA does not control the day-to-day operations of designated airworthiness representatives . . . while the FAA acts generally as an overseer, it does not manage the details of a designated representative's work or supervise him in his daily investigative duties." _Id._ at 1081. The Court noted that "the FAA has no customary contractual relationship with [DARs], nor are they on the FAA payroll or otherwise compensated by the FAA . . . Instead, a [DAR] is paid by the certificate applicant..." _Id._ Although the government has

13

promulgated specific regulations governing the inspection process with which the DAR has to comply, the FAA does not control a DAR's day-to-day inspection duties.   The Appellate Court pointed to the legislative history of the Civil Aeronautics Act, which "indicates that if Congress did not allow delegation of inspection to private persons, the Civil Aeronautics Administration would be required to employ 10,000 additional personnel." Id. (citing S.Rep. No. 803, 81st Cong., 1st Sess. 3 (1949)).   The election by Congress to delegate FAA inspection duties to private persons indicates that "Congress did not intend to bring [DARs] within the scope of federal employment." Id.

In declining to hold the government liable for acts of the DARs, the Charlima Court echoed the concern expressed by the First Circuit in Zabala Clemente v. United States, that the "end result of attaching liability to government attempts at all levels to supplement the safety precautions of private individuals and businesses, even when there is no reliance on the government's assistance, is far more likely to increase the reluctance of the government to involve itself in such matters..." Charlima, 873 F.2d at 1082 (quoting Zabala Clemente v. United States, 567 F.2d 1140, 1150 (1st Cir 1977), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978)); see also Leone v. United States, 910 F.2d 46 (2d Cir. 1990)(in case claiming that airman medical certificate had been negligently issued, holding that private

14

physicians designated by the FAA as Aviation Medical Examiners are not government employees for purposes of the FTCA).

In the case before this Court, the record reflects that, on July 21, 2004, DAR Cernuda signed and issued an SAC for the Helicopter after he "worked to secure the necessary inspections, and assure compliance to both the Type Certificate Data Sheet and the pertinent Federal Aviation Regulations..." Cernuda Affidavit ¶ 4. Although Cernuda now suggests that he "worked in conjunction with Carlton Kitchen" ("Kitchen"), an FAA employed Aviation Safety Inspector ("ASI"), id. at ¶ 6, it appears that Kitchen's role was limited to reviewing certification packages submitted by Cernuda for completeness only.

In his affidavit, Kitchen explains that his responsibility as Assistant Advising ASI involved the monitoring and oversight of Cernuda and other DARs in the Fort Lauderdale area, including, inter alia, "conducting yearly meetings with the DARs" and ensuring that they are qualified through "periodic observations of the DARs as they perform their duties." Kitchen Affidavit ¶¶ 9-11. Nothing in Kitchen's or Cernuda's descriptions of their respective activities indicates that Kitchen or any other FAA employee performed "day-to-day oversight" of Cernuda's physical performance.

Cernuda's suggestion that the Administrator "has the ultimate authority" to issue SACs, Cernuda Affidavit ¶ 12, fails to acknowledge that the Administrator is permitted to delegate the

15

issuance of SACs to DARs like Cernuda, a task which Cernuda performed for more than twenty years. Moreover, it is undisputed that Cernuda did not receive payment or employment benefits from the FAA and that, although Cernuda received initial and recurrent training from the FAA, he was responsible for his own travel expenses and set his own training schedule. Cernuda received a fee from certificate applicants for his services and had to provide for his own tools, equipment, and office or other work space.

In sum, there is nothing to distinguish Cernuda from the DARs in Charlima and, like those DARs, Cernuda issued the SAC for the Helicopter in his capacity as an independent contractor. Because claims under the FTCA are limited to claims for damages caused by negligent or wrongful acts by federal employees while acting within the scope of their employment, this Court has no subject matter jurisdiction over this case.

(2) "Misrepresentation"

Even if Cernuda were deemed an FAA employee, plaintiffs's claim is subject to a further exception to the government's waiver of sovereign immunity under the FTCA. The United States is immune from liability for "[a]ny claim arising out of . . . misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h) (emphasis added); Muniz-Rivera v. United States, 326 F.3d 8, 13 (1st Cir. 2003)(holding that homeowner's claims that government (a) failed to warn them of propensity to

16

flood or advise them of need for flood insurance and (b) negligently inspected their homes was barred by misrepresentation exception to FTCA's waiver of sovereign immunity).

The plaintiffs in Muniz-Rivera, with the assistance of loans extended by federal agencies, purchased homes constructed in an area later revealed as being prone to flooding. The district court dismissed the claim for lack of subject matter jurisdiction and the First Circuit affirmed.

The plaintiffs alleged, inter alia, that the "government's intimate role in approving, financing, and monitoring the housing projects implicitly conveyed an assurance that the homes constitute secure domiciles, and that the lack of any warning calculated to alert the plaintiffs to the likelihood of future harm reinforced those implied assurances." Id. at 13. The First Circuit concluded that, "[e]ven if such acts and omissions were negligent . . . the misrepresentation exception precludes the assertion of a cause of action against the government based upon either miscommunication or non-communication of the information in question." Id. (citations omitted).

With respect to the plaintiffs' contention that the government's home inspections were negligent, the Muniz-Rivera Court held that those claims were also precluded by the misrepresentation exception. The Court explained that "[a] negligent inspection, in and of itself, cannot cause injury. Harm

17

can occur (and thus, liability can attach) only if the inspection leads either to the communication of inaccurate information or to a failure to communicate precautionary information." Id. at 13-14.

In United States v. Neustadt, the Supreme Court concluded that "in enacting section 2680(h), Congress 'clearly meant to exclude claims arising out of negligent, as well as deliberate, misrepresentation.'" Muniz-Rivera v. United States, 326 F.3d at 13 (quoting United States v. Neustadt, 366 U.S. 696, 702, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961)). The Supreme Court further explained that "the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." Block v. Neal, 460 U.S. 289, 296, 103 S.Ct 1089, 75 L.Ed.2d 67 (1983).

The First Circuit has specifically distinguished misrepresentation claims as "traditional and commonly understood" from misrepresentation "as a method of accomplishing various types of (other) tortious conduct." Jiminez-Nieves v. United States, 682 F.2d 1, 4 (1st Cir. 1982)(citing the Restatement (Second) of Torts). With respect to the second category, the Court cited examples of inducing a person to eat poisoned chocolates (battery), restraining a person under false claim of legal authority (false imprisonment), and causing an accident by signaling a wrong turn (negligence). Id. at 4. By contrast, the tort of misrepresentation "protect[s] a person's interest in obtaining true

information (from those with a duty to provide it) when making up his mind about an important matter." Id. at 4.   The "one essential element of misrepresentation remains reliance by the plaintiff himself upon the false information that has been provided." Id. at 4 (citing Restatement (Second) of Torts s 525 at 55, s 537 at 80, s 552 at 126, and s 552C at 141).

The plaintiffs, in their complaint, stated that the Helicopter had been issued an SAC in the Normal Category at the time they purchased it from CAVU Copters, and that it was "imperative to [their] business purposes" that the Helicopter had such a certificate "because the intended use of the Helicopter was to transport passengers for hire." Complaint ¶ 21.   The plaintiffs also alleged that, in addition to the purchase cost of the Helicopter, they expended large sums of money for acquisition of permits and advertising the air tours service.   Complaint ¶¶ 22, 23.   Because the SAC was subsequently withdrawn, the plaintiffs could no longer "use the Helicopter for the business purposes for which the Helicopter was specifically purchased." Id. ¶ 34.

Although plaintiffs style their complaint as one for negligence related to the erroneous issuance of the SAC, it is clear that the basis for their claim (and for the economic harm they assert) is their reliance on the erroneously issued SAC in purchasing the Helicopter and incurring further expenditures to start an air tours business.   Had the DAR not issued an SAC in the

Normal Category for the Helicopter, the aircraft would have been of no use to the plaintiffs in their planned venture and they would not have purchased it or proceeded to obtain permits and engage in advertising. In other words, the plaintiffs are not alleging that they have sustained direct injuries, to either person or property, from the erroneous issuance of the SAC. Instead, their asserted damages are limited to the expenditures which they incurred in reliance on the government's representation, embodied by the SAC, that the Helicopter could be used for the commercial transport of passengers. Because the government's representation was later determined to be erroneous, the case falls squarely into the statutory exception to sovereign immunity.

As the government points out, other courts which have addressed cases related to erroneously issued certificates of airworthiness have come to the same conclusion. See e.g., Marival, Inc. v. Planes, Inc., 306 F. Supp. 855 (N.D. Ga. 1969)(third party claim against government by seller who misrepresented airworthiness of plane based on certificate issued by FAA inspector was barred under misrepresentation exception); Lloyd v. Cessna Aircraft Co., 429 F. Supp 181, 183 (E.D. Tenn. 1977)(discussing cases in which "courts have held that negligent inspections and testing by government officials, which conduct results in incorrect information being reported and relied upon, in reality amount to a claim arising out of misrepresentation so as to be precluded by the

[misrepresentation] exception to the [FTCA]").

In the instant case, the plaintiffs' complaint is, at its core, based on misrepresentation as to the status of the Helicopter, on which they relied to their economic detriment. Therefore, the plaintiffs' claims are barred under the misrepresentation exception of the FTCA.

Because the Court is precluded from assuming subject matter jurisdiction over the case for two independent reasons, the government's final argument, i.e. that the plaintiffs fail to allege a cause of action under state law, need not be addressed.

## Conclusion

For the reasons stated herein, the Government's motion to dismiss the complaint for lack of subject matter jurisdiction is GRANTED.

SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
Chief United States District Judge

December 16, 2011